FILED

2004 Nov-24  PM 02:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION**

| | | |
|---|---|---|
| **PAMELA JEAN GARMON**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: **CV-04-PT-1137-M** |
| | ) | |
| **LIBERTY LIFE ASSURANCE** | ) | |
| **COMPANY OF BOSTON**, | ) | |
| | ) | |
| Defendant. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The parties agreed to submit the case on the administrative record and briefs as if a trial

had been conducted.

### FACTS AND PROCEDURAL HISTORY

Plaintiff Pamela Jean Garmon ("Garmon") has been a registered nurse for 28 years and

has worked for the Baptist Medical Center in Cherokee County for 18 years. Garmon testified

that she purchased a long term disability insurance plan from defendant Liberty Life Assurance

Company of Boston ("Liberty Life") in 1999 but that she never received an insurance policy.

Garmon claims she became disabled due to fibromyalgia, chronic fatigue, depression and

insomnia in January 2002. Following a visit with Dr. Bell on January 2, 2002, Garmon gave a

two-week notice and worked until January 23, 2002.

According to Garmon, because there was a 90 day waiting period for disability benefits,

she waited until March 14, 2002 before filing for such benefits. In a letter dated May 24, 2002,

Liberty Life denied Garmon's claim by stating that she became disabled the day after she last

worked and therefore had no coverage. The letter stated:

> Since your date of disability is January 24, 2002 and you were (*sic*) terminated
> your employment with Baptist Health System Inc. on January 23, 2002, we are
> unable to approve your claim.

Garmon appealed this denial by letter on June 5, 2002. In her letter, Garmon explained that Dr.

Bell found that she was disabled on January 2, 2002, but that she worked a notice until January

23, 2002. Garmon has been awarded Social Security disability benefits effective January 24,

2002.

Garmon submitted a letter from Dr. Rita Patton dated March 15, 2002 which stated that

she was disabled due to depression, anxiety and fibromyalgia. The letter stated in part:

> Ms. Garmon has been treated by me since February 26, 2001. She sufferers (*sic*)
> from depression, anxiety and fibromyalgia. Ms. Garmon is currently unable to
> work secondary to her problems as noted above.

Garmon also submitted medical records from Dr. Patton dated November 26, 2001 and March 1,

2002.

Liberty Life received Dr. Bell's records of Garmon's treatment from January 2002

through May 15, 2002 on June 26, 2002. Liberty Life also received Dr. Brian Perry's records of

Garmon's treatment from April 18, 2002 through May 7, 2002 on May 22, 2002 and Baptist

Montclair's records of Garmon's treatment dated May 14, 2002 on May 21, 2002.

Liberty Life gave a final denial of Garmon's appeal through a letter dated July 2, 2002.

The letter stated in part:

> A review of the medical information in the claim file from Drs. Patton, Bell and
> Perry indicates that there is no substantial evidence of total disability. Indeed Ms.
> Garmon was able to work full time in her own occupation until her day of
> termination.

Liberty Life did not receive or request any additional medical records from the time of the denial

2

on May 24, 2002 until the final denial of the appeal on July 2, 2002.  The appeal

recommendation prepared by Liberty Life's appeal review consultant on July 2, 2002 stated that

Garmon "had no evidence of total disability from a medical perspective."

Following the final denial, Garmon sought the assistance of counsel, who wrote a letter to

Liberty Life on her behalf on March 8, 2004.  In that letter Garmon's counsel included additional

medical records which were not present in the claim file.  One of these documents was a medical

evaluation of Garmon conducted by Psychologist Dr. David R. Wilson on August 7, 2002.  In

that evaluation Dr. Wilson stated:

> Ms. Garmon is currently experiencing clinical depression which is moderate in
> severity.  She also has a generalized anxiety disorder.  Her ability to relate
> interpersonally and withstand the pressures of everyday work is certainly
> impaired due to the nature of her depressive symptoms and anxiety.  She is
> certainly limited in ability to tolerate normal stress and vocational pressure.  She
> has deficits which would interfere with her ability to remember, understand and
> carry out previous nursing activities.  She is impaired in ability to relate to
> supervisors and other employees due to her anxiety and depressive
> symptomology.

Also in that evaluation, Dr. Wilson diagnosed Garmon with "Axis I" "296.32 Major Depressive

Disorder, Recurrent, Moderate" and "300.02 Generalized Anxiety Disorder."

Also included with the May 8, 2004 letter from Garmon's counsel was a letter from Dr.

Jason Junkins dated March 3, 2003 and his records of Garmon's treatment from October 23,

2002 through February 27, 2003.  In his March 3, 2003 letter, Dr. Junkins stated:

> Mrs. Pam Garmon has been my patient for several months in my Internal
> Medicine practice in Centre, Alabama.  She has a diagnosis of Fibromyalgia
> which has been very progressive over the past several months.  She used to work
> as a nurse but is unable to work any more because even small amounts of work
> leave her in pain and exhaustion.  It can take hours to days to recover from
> strenuous activity.
>
> She is dependent on her husband for most of the day-to-day activities in her life

3

> including shopping, cooking, driving and timing of [her] medication. She is
> neither medically or mentally able to sustain gainful employment. (Emphasis
> added).

In addition to these documents, Garmon's counsel also included with the letter to Liberty

Life additional records of Dr. Patterson of Garmon's treatment from November 26, 2001 through

April 22, 2002 and records from Dr. David A. McClain of Garmon's treatment from April 2,

2003 through May 13, 2003, including a physical capacity evaluation dated May 13, 2003.

In response to the new medical records, Liberty Life, in a letter dated April 19, 2004,

again denied the claim. This letter stated in part:

> Based on a review of this information, it was determined not only did Ms.
> Garmon not have LTD coverage as of the date of her last day of employment,
> Liberty also did not have proof of disability on that date, be it January 22, or 23rd.
> . . .
>
> Based on the information provided, there is no objective medical data that is the
> result of a formal mental status examination to substantiate problems of cognitive
> impairment, memory problems, or problems with concentration. Her complaints
> are subjective in nature. . . .
>
> There was no objective data to substantiate problems of any significant degree
> with memory, concentration, or cognition. . . .
>
> Liberty Life Assurance Company of Boston has conducted a full and fair review
> of your appeal and accompanying materials, and has determined that the denial of
> benefits will be maintained.

Garmon filed the current action against Liberty Life on April 21, 2004 in the Circuit

Court of Etowah County, Alabama. Liberty Life removed the action to this court on June 3,

2004. On November 2, 2004, Plaintiff filed an Amended Complaint.[1]

---

[1] The Amended Complaint contains one count and states:

> Plaintiff has long term disability insurance benefits provided by Defendant
> through her employment with Baptist Medical Center in Cherokee County,

4

The following is a summary of the pertinent evidence related to the alleged disability of the plaintiff.

## I.    Evidence Purporting to Support Plaintiff's Argument of Disability.[2]

### A.    Treatment by Dr. Bell.

On May 14, 2001, plaintiff visited Dr. Bell and complained of suffering for one and a half years with diffuse musculoskeletal symptoms. Plaintiff told Dr. Bell that the symptoms began occurring three to four days per week and then progressed to become a daily occurrence. She reported being exhausted all the time. She also stated that she felt tension and aches in all of her muscles, but particularly in the neck and shoulders. Additionally, plaintiff had cold fingers. Plaintiff indicated that she was too tired to get up in the morning and that she had suffered in the past from restless legs at night. She had previously been diagnosed with mitral valve prolapse. Plaintiff also stated that she had been depressed for seven years and that there was a family history of depression. Dr. Bell diagnosed her with neck pain, restless leg syndrome, mitral valve prolapse, depression and probably fibromyalgia.

---

Alabama.  Plaintiff became totally disabled as defined by said policy in January 2002.  Under the contract, Defendant is required to pay 60% of Plaintiff's income at the time she became disabled.  Plaintiff became totally disabled as defined by said policy in January 2002.  Plaintiff was entitled to benefits effective April 2002.  Defendant has refused to pay long term benefits.  Plaintiff has exhausted her administrative remedies.  Plaintiff is entitled to long term disability benefits.

The Amended Complaint requests appropriate equitable relief, damages, attorney's fees, and costs.

[2] In addition to fibromyalgia and depression, plaintiff's medical records indicate that she has been diagnosed with numerous other medical conditions.  According to her medical records, plaintiff received silicone breast implants in 1975.  These implants later ruptured and were replaced with saline implants in 1992.

Plaintiff visited Dr. Bell June 15, 2001 and reported that she was feeling better. However, she also called herself "the poster girl" for fibromyalgia.

During an October 18, 2001 appointment with Dr. Bell, plaintiff reported that she had no energy and that she hurt all over, and particularly in the neck and shoulders. She stated that she felt like she had the flu. Plaintiff asserted that she was having difficulty with snoring and restless legs at night. Additionally, she was only able to walk ten minutes a day on a track.

Dr. Bell's records indicate that he advised plaintiff to cease work on January 2, 2002. Dr. Bell indicated this information on a Restrictions Form sent to defendant. Dr. Bell's notes from January 2, 2002 indicate that plaintiff had sleep studies performed on her. These studies revealed that, despite taking 10 mg of Ambien, she had very poor sleep. These notes also state, "[plaintiff's] neck at the base is painful. She notes having to lift patients at her work and this does exacerbate her symptoms."

On May 15, 2002, Plaintiff reported low back pain to Dr. Bell and he gave her a short course of Prednisone. Plaintiff told Dr. Bell that the she had had the back pain since February 2002, and that she believed she may have injured herself during some of her prior work activities. Plaintiff also reported tenderness in the lower sacroiliac area on the left side.

**B.    Treatment by Dr. Patton.**

On November 26, 2001, Dr. Patton did a psychological evaluation of plaintiff. Plaintiff reported feeling depressed for 6 or 7 years. Plaintiff further complained of weakness and tiredness, and stated that she could not function at work. Dr. Patton diagnosed plaintiff with depression, anxiety and fibromyalgia. Dr. Patton prescribed Celexa.

During a March 1, 2002 appointment with Dr. Patton, plaintiff reported feeling worse and

6

more depressed.

On March 15, 2002, Dr. Patton wrote a letter indicating that plaintiff has been treated by her since February 26, 2001. The letter noted that plaintiff suffers from depression, anxiety and fibromyalgia and is unable to work because of these problems. The letter stated in part:

> Ms. Garmon has been treated by me since February 26, 2001. She sufferers (*sic*) from depression, anxiety and fibromyalgia. Ms. Garmon is currently unable to work secondary to her problems as noted above.

On April 22, 2002, Dr. Patton completed and returned a Mental Status Restrictions Form to defendant. On that form, Dr. Patton indicated that plaintiff was under significant restrictions in her ability to perform daily occupational and social activities, including her ability to sustain work performance and cope with work pressure.

###### C.     Evaluation by Dr. Wilson, Ph.D.

Dr. Wilson, who did a disability determination for plaintiff on August 7, 2002, reported that she had been treated with Prozac, Elavil, and Zolfot in the past, but that those medications had given her little relief of symptoms. Dr. Wilson noted that plaintiff's then current medication regimen consisted of Paxil along with Klonopin and Ambien. Plaintiff was also being treated with Ultram and Skelaxim for her fibromyalgia symptoms. According to Dr. Wilson, plaintiff displayed poor self-esteem and reported guilt. Plaintiff also reported decreased appetite, low energy, decreased libidinal urges, and internal, middle and terminal insomnia. Plaintiff reported to Dr. Wilson that she usually wakes up at 10:30 a.m. and then takes her medication and lies on a couch. She also reported lying down and resting for several hours around 1:00 p.m. to 3:00 p.m. Dr. Wilson found that plaintiff suffered from a major depression and a recurrent, moderate, and generalized anxiety disorder. He believed plaintiff was psychiatrically disabled. Dr. Wilson

7

stated:

> [Plaintiff's] ability to relate interpersonally and withstand the pressures of everyday work is certainly impaired due to the nature of her depressive symptoms and anxiety. She is certainly limited in ability to tolerate normal stress and vocational pressure. She has deficits which would interfere with her ability to remember, understand and carryout (*sic*) previous nursing activities. She is impaired in ability to relate to supervisors and other employees due to her anxiety and depressive symptomology.

### D.    Treatment by Dr. Junkins.

Plaintiff began seeing Dr. Junkins on October 23, 2002 for treatment for her depression, anxiety, fibromyalgia and other disorders. During a February 27, 2003 appointment with Dr. Junkins, plaintiff reported that she had experienced a few episodes of falling and imbalance. On March 3, 2003, Dr. Junkins wrote a letter indicating that plaintiff was unable to work because of progressive fibromyalgia. The letter indicated that plaintiff was dependent on her husband for most day-to-day activities including shopping, cooking, driving, and the timing of her medications. It also stated that plaintiff was neither medically nor mentally able to sustain gainful employment. The letter stated, "even small amounts of work leave [plaintiff] in pain and exhaustion. It can take hours to days to recover from strenuous activity."

### E.    Treatment by Dr. McLain, Rheumatologist.

On April 2, 2003, Dr. McLain's physical examination of plaintiff indicated that she was suffering tenderness in her head and neck. According to the records, plaintiff had 16 of 18 tender points characteristic of fibromyalgia syndrome. Dr. McLain assessed that plaintiff had fibromyalgia, coccydynia, mitral valve prolapse, depression, irritable bowel syndrome, and chronic fatigue syndrome. Dr. McLain's notes indicate that plaintiff reported sleeping over 12 hours a day and not feeling rested. She also reported insomnia and trouble getting out of a

8

bathtub and getting dressed.  Plaintiff further reported anxiety, depression and problems with her memory.

On May 13, 2003, Dr. McLain completed a physical capacity evaluation of plaintiff.  He determined that plaintiff was significantly diminished in her physical capacity, only being able to sit for one hour at a time, stand for 15 minutes at a time, and walk for 15 minutes at a time.  In total during the eight-hour day, plaintiff was able to sit for four hours and stand and walk for one hour.  She was unable to lift or carry over 10 pounds.  Additionally, she was unable to push or pull with her arms or her legs.  She was only occasionally able to bend and reach and had only one-third of a normal range of motion.  At the time of the examination, plaintiff was taking Neurontin, Calcium, Ultram, Ambien, Atenolol, Paxil, Clonazepam, and Zanaflex.

### F.      Treatment by Dr. Perry.

Dr. Perry's notes from April 18, 2002 state, "Pam has had several episodes of anxiety and depression over the last few years. . . . Her anxiety and depression have seemed to be getting a little worse.  She is just unable to work at all."

Dr. Perry's records indicate that Plaintiff complained of bilateral lower hip pain on May 7, 2002.  There was also some tenderness and pain in her lower back.

Dr. Perry indicated in a Restrictions Form faxed to defendant on May 21, 2002 that he had been treating plaintiff since February 12, 1986.  According to his records, plaintiff was diagnosed with fibromyalgia, fatigue, depression and insomnia.  Additionally, his records indicated that plaintiff had persistent problems bending and lifting any weight.  Further, he reported that plaintiff suffered from shoulder and back tenderness that was made worse by lifting or pulling.  He indicated that plaintiff is unable to squat, climb, push, pull, or lift anything

9

heavier than 10 pounds.

### G.   Evaluation of Medical Records by Defendant's Expert.

In evaluating plaintiff's medical records for defendant, Dr. Perez, a board certified

physician in internal medicine, stated:

> It is very possible that Ms. Garmon has fibromyalgia based on the application of
> the ACR classification.  She:
> 1. Had widespread pain for more than three months.
> 2. Had axial skeletal pain.
> 3. Had pain [in at] least 11 of the 18 tender points.

He also acknowledged that the record indicated that plaintiff has a variety of features that both

chronic fatigue syndrome and fibromyalgia syndrome share, including musculoskeletal pain,

significant fatigue, tender points, sleep disturbance, irritable bowel syndrome, and cognitive

impairment.

### H.   Surveillance of Plaintiff by Defendant's Agents.

Defendant hired an agency to conduct surveillance of plaintiff to determine if her day-to-

day actions refuted her claims of disability.  This surveillance was conducted from Thursday,

March 25, 2004 through Saturday, March 27, 2004.  The investigator, who watched plaintiff's

home, did not witness any activity inconsistent with plaintiff's claims of disability.  Plaintiff did

not leave her house at any point during the surveillance.

### I.   Review of Plaintiff's Records by Defendant's Nurse-Employee.

On May 8, 2002, a nurse employed by defendant reviewed plaintiff's file.  The employee

appears to conclude that the records supported restrictions and limitations on activity because of

plaintiff's major depression.  The notes from that review state in part:

> Medicals support M&N R&LS, as EES symptoms are C/W a major depression
> responding slowly to treatment. . . . EES fatigue may be R/T her depression.  R/T

10

ongoing M&N symptoms, EE would be limited in regards to activities requiring contact w/ people & cognitive functions. Medicals from providers showing how DX of FMS, chronic fatigue & dysautonomia were arrived at would help make a more complete assessment.

### J.     Social Security Disability Award.

On August 18, 2003, the Social Security Administration determined that plaintiff was

disabled. A letter sent by the Administration on that day stated:

> After a thorough evaluation of the entire record, it is concluded that the claimant has been disabled since January 23, 2002, and met the insured status requirements of the Social Security Act on that date and thereafter, through December 2006. . . . The claimant has the following impairment, which is considered to be "severe" under the Social Security Act and Regulations: fibromyalgia. . . . The claimant does not have transferable skills to perform other work within her physical and mental residual functional capacity.

## II.     Evidence Purporting to Support Defendant's Argument of No Disability.

### A.     Plaintiff's Medical Treatment.

During plaintiff's November 26, 2001 appointment with Dr. Patton, the mental status

examination showed plaintiff to have no suicidal or homicidal ideation. There was also no

evidence of psychosis, and no problems with memory, concentration or cognition. Plaintiff's

thought content was also normal with no paranoia, delusions or hallucinations.

Dr. Bell's notes from January 2, 2002 indicate that at the time of her appointment she

was not in acute distress and she was not obviously depressed.

Dr. Wilson's August 7, 2002 mental status examination of plaintiff showed that she had

clear sensorium, was fully oriented, and had normal speech and thought processes. Dr. Wilson

noted that "[t]here was no evidence of confusion, looseness of associations, or tangentiality."

Plaintiff also showed no evidence of delusions and was not paranoid. Additionally, Dr. Wilson

found plaintiff was not suicidal or homicidal , and she was able to think abstractly and interpret

proverbs.

During a February 25, 2003 visit with Dr. Junkins, plaintiff was doing well and was without complaints. Her depression and pain were also controlled.

    **B.**    **Review of Plaintiff's Medical File by Defendant's Experts.**

        **1.**    **Dr. Polsky, Board Certified Psychiatrist.**

Dr. Polsky reviewed plaintiffs medical records and concluded that the evidence was not sufficient to support a diagnosis of major depression or generalized anxiety disorder on January 22, 2002. Dr. Polsky also stated that the current treatment plan of medication and individual psychotherapy as suggested by Dr. Wilson was appropriate. Dr. Polsky asserted that plaintiff's complaints are of a subjective nature and are not supported by the medical evidence provided. He also sated that, "[b]ased on the information provided, there is no objective medical data that is the result of a formal mental status examination to substantiate problems of cognitive impairment, memory problems, or problems with concentration." Dr. Polsky also found no evidence that plaintiff was unable to perform her activities of daily living. He concluded, "[b]ased on the records, the available clinical documentation does not indicate there was any significant worsening in Ms. Garmon's condition that would dictate her having to stop working."

        **2.**    **Dr. Perez, Board Certified Internal Medicine.**

Dr. Perez examined plaintiff's medical records and found that her self-reported limitations were not substantiated at the time she stopped working in January 2002. He stated that most of her complaints were subjective and not backed up by a significant diagnostic finding besides the presence of tender points. Dr. Perez maintained that, based on the objective findings, there was no evidence for a neurological diagnosis. Similarly, he stated, "[t]here is no evidence

12

of joint dysfunction or joint swelling or synovitis consistent with a severe impairment." He

further asserted that the medical information did not support restrictions or limitations on

plaintiff's activities. Additionally, Dr. Perez stated that plaintiff had multiple unexplained

syndromes and that she reported a level of impairment that was disproportionate to the physical

examination results. He asserted, "[a]lthough her physical examination is not completely

normal, it is not one that supports inability to work." Finally, Dr. Perez concluded that the

"[r]ecords do not support that her condition, whatever the diagnosis, caused an impairment

preventing her from being able to perform her job duties effective January 2002."

### ERISA STANDARD

A district court's review of an ERISA plan's denial of benefits under § 502(a)(1)(B) is to

be reviewed *de novo*, unless "the benefit plan gives the administrator or fiduciary discretionary

authority to determine eligibility for benefits or to construe the terms of the plan," in which case

the court reviews whether the decision maker acted in an arbitrary or capricious manner.

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Consistent with *Firestone*, the

Eleventh Circuit has adopted three standards of review under § 502(a)(1)(B): (1) *de novo*,

applicable where the plan administrator has no discretion, (2) arbitrary and capricious (abuse of

discretion), where the plan grants discretion to the administrator, and (3) heightened arbitrary

and capricious, where the plan grants discretion but the administrator is acting under a conflict of

interest. *Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1449 (11th Cir. 1997).[3] These

standards of review apply to both the administrator's construction of the plan and the factual

---

[3] The third standard of review is derived from *Firestone*, where the Supreme Court noted
that a conflict of interest is a factor to be weighed in determining whether there has been an
abuse of discretion. 489 U.S. at 115.

findings associated with each individual case. *Paramore*, 129 F.3d at 1451. A very succinct

summary of the standards and a formula for analysis is given in *Williams v. BellSouth*

*Telecommunications, Inc.*, 373 F.3d 1132, 1138 (11th Cir. 2004).

## ARGUMENTS

### I.    Plaintiff's Position

#### A.    Standard of Review.

Plaintiff argues that the *de novo* standard of review applies in this case because there is

no evidence that a Plan expressly gave the defendant discretionary authority to determine

eligibility for benefits.[4]  Plaintiff points out that in the Eleventh Circuit the *de novo* standard of

review applies unless the benefit plan expressly gives the administrator discretionary authority:

> Contrary to the argument of the insurance company that discretionary authority
> can be implied from the plan, the circuit courts which have found that particular
> ERISA plans granted discretion to plan administrators or fiduciaries, in cases
> decided after *Firestone*, have uniformly rested this finding upon express language
> of the ERISA plan before them. Indeed, this court has recently stated that the
> "discretionary authority" to which *Firestone* refers must be "expressly give[n]" by
> the plan. *Guy v. Southeastern Iron Workers' Welfare Fund*, 877 F.2d 37, 38-39
> (11th Cir.1989) (finding requisite grant of discretionary authority where plan
> stated "full and exclusive authority to determine all questions of coverage and
> eligibility" as well as "full power to construe the provisions of [the] Trust"
> belonged to trustees)

*Moon v. American Home Assur. Co.*, 888 F.2d 86, 88 (11th Cir. 1989).

According to plaintiff, ERISA does not authorize an insurance company to reserve

discretionary authority unto itself. Instead, plaintiff asserts, discretionary authority must be

expressly delegated. Plaintiff argues that in this case the employer has not delegated

---

[4] In some arguments, the plaintiff has referred to the defendant as "UNUM.." Defendant
has responded to the allegations of plaintiff with the belief that they were intended to refer to
Liberty Life as the claim administrator of the policy, not UNUM. The court assumes likewise.

discretionary authority to defendant expressly or otherwise.  Plaintiff states that defendant has

not produced any plan which delegates discretionary authority to it, as the insurance company.

In the alternative, plaintiff argues that, if the court holds that an express delegation of

discretionary authority is not needed and that defendant can reserve discretionary authority by its

insurance contact, the appropriate standard of review would be the heightened arbitrary and

capricious standard as established in *Brown v. Blue Cross and Blue Shield of Alabama, Inc.*, 898

F.2d 1556, 1563 (11th Cir. 1990), in which case the burden shifts to defendant to show the

decision is not tainted by self interest:

> Under the heightened standard of review, "the burden shifts to the claims
> administrator to prove that its interpretation of the plan is not tainted by
> self-interest." HCA Health Serv[s. of Georgia v. Employers Health Ins. Co.], 240
> F.3d [982,] 994 [(11th Cir. 2001)]. The claims administrator satisfies this burden
> by showing that its "wrong but reasonable" plan benefits the class of participants
> and beneficiaries. See *id*. at 995. Even if the claims administrator accomplishes
> this task, "the claimant may still be successful if he can show by other measures
> that the administrator's decision was arbitrary and capricious." See *id.* If it cannot
> be shown that the participants and beneficiaries of the plan are benefitted, then the
> claims administrator's plan interpretation is not entitled to deference.

*Migliaro v. IBM Long-Term Disability Plan,* 231 F.Supp.2d 1167, 1177 (M.D. Fla. 2002).

If the heightened arbitrary and capricious standard of review applies, plaintiff maintains

that the review applies to findings of fact and interpretation of the plan:

> We hold that, where a conflict of interest exists, an ERISA plan administrator's
> decision to deny benefits is to be reviewed under the heightened arbitrary and
> capricious standard of *Brown*, regardless of whether the decision turns on findings
> of fact or on interpretations of plan terminology.

*Torres v. Pittston Co.*, 346 F.3d 1324, 1334 (11th Cir. 2003).

## B.    Judicial Review of ERISA Claims.

Plaintiff points out that in *Williams v. BellSouth Telecommunications, Inc.*, 373 F.3d

1132 (11th Cir. 2004), the Eleventh Circuit recently defined the process of judicial review of

ERISA benefit denials:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
> (2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
> (3) If the administrator's decision is "*de novo* wrong" and he *was* vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
> (5) If there is no conflict, then end the inquiry and affirm the decision.
> (6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

*Williams*, 373 F.3d at 1138 (citations omitted).[5]

### C.   Decision to Deny Benefits Was Wrong.

According to plaintiff, Liberty Life maintains that her insurance terminated on January

22, 2002 and she had no insurance on January 23, 2002, the date of her disability. Plaintiff

asserts that, alternatively, defendant claims there is no medical evidence of disability. Plaintiff

points out that Liberty Life maintained that position after plaintiff's counsel submitted five sets

of medical records.

Plaintiff states that she is an RN with an excellent work history and that she continued to

work for two years with symptoms of fatigue and fibromyalgia. Plaintiff points out that on

January 2, 2003, Dr. Bell took her out of work because of her disability and that she gave two

---

[5] This court will apply this form of review to this case.

weeks notice and last worked on January 22, 2002.

Plaintiff argues that her diagnosis of total disability has been confirmed by Drs. Patterson, Bell, Perry, Wilson and Junkins. According to plaintiff, defendant never sought another medical opinion. Given the evidence of her disability, plaintiff maintains she is entitled to the benefits of the long term disability insurance that she purchased from defendant.

## II.     Defendant's Response

### A.     The Proper Standard of Review.

Contrary to plaintiff's position, defendant claims that an "arbitrary and capricious" or "abuse of discretion" standard of review should be applied to its denial of plaintiff's claims for disability benefits. Defendant asserts that in an ERISA case a reviewing court should apply an arbitrary and capricious/abuse of discretion standard of review where the benefits plan in question gives the fiduciary discretion to interpret the provisions of the plan. *Brown v. Blue Cross and Blue Shield of Alabama, Inc.*, 898 F.2d 1556, 1563 (11th Cir. 1990). Defendant argues that the group policy in question in this case gives it, as the fiduciary, broad discretion to interpret the provisions of the plan. The policy states:

> Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding.

Defendant's Exhibit A, p. LIB-Garmon 27. Because the policy vests sole discretion to make decisions regarding benefit eligibility in Liberty Life, defendant argues, its decision denying plaintiff's claim for benefits should be reviewed under the arbitrary and capricious/abuse of discretion standard.

Defendant argues that plaintiff's claims that a more stringent standard of review should

17

be applied to Liberty Life's decision are not supported by the governing law. Plaintiff cites

*Moon v. American Home Assurance Company*, 888 F.2d 86 (11th Cir. 1989), for its proposition

that the *de novo* standard should apply in this case. Contrary to plaintiff's position, defendant

maintains that *Moon* demonstrates that the arbitrary and capricious standard is the proper

standard here. In considering which standard to apply, the *Moon* court stated that "the

'discretionary authority' to which *Firestone* refers [which merits a lower standard of review]

must be 'expressly give[n]' by the plan." 88 F.2d at 88. Defendant notes that the *Moon* court

cited *Guy v. Southeastern Iron Workers' Welfare Fund*, 877 F.2d 37 (11th Cir. 1989), for this

proposition. The *Guy* court found the necessary grant of discretion where the plan provided the

trustees with "'full and exclusive authority to determine all questions of coverage and eligibility'

and 'full power to construe the provisions of [the] Trust....'" 877 F.2d at 39.

　　　　Defendant agrees that the discretion-granting language in this case is even clearer than

that cited in *Guy* and *Moon*. Because the policy explicitly grants Liberty Life discretion to

determine plaintiff's eligibility for benefits, defendant argues, the arbitrary and capricious/abuse

of discretion standard, and not a *de novo* standard, is appropriate in this case.

　　　　Defendant asserts that, in *Williams*, the Eleventh Circuit held that a heightened arbitrary

and capricious review should be applied in cases where the plan at issue grants the administrator

discretion, but the administrator has a conflict of interest because it both funds and administers

the plan. *See Williams*, 373 F.3d at 1134-35 (*citing Firestone Tire & Rubber Co. v. Bruch*, 489

U.S. 101 (1989)). If such a conflict exists, the reviewing court is to apply a level of judicial

review "somewhere between what is applied under the *de novo* and 'regular' arbitrary and

capricious standards." *Williams*, 373 F.3d at 1137. The *Williams* court employed a multi-step

18

analysis that first analyzed whether the administrator's decision was *de novo* wrong. *Id.* at 1138

(citing *HCA Health Servs. of Georgia, Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 993 n.23

(11th Cir. 2001)). If the court determines that the administrator's decision was in fact correct,

based on its strict *de novo* review, then its inquiry ends and the administrator's decision is

affirmed. *Id.*[6]

Despite its arguments for the use of an arbitrary and capricious/abuse of discretion

standard, defendant maintains that, even if the strictest possible standard of judicial review is

applied, its decision to deny plaintiff's claim for benefits was entirely justifiable under the

circumstances discussed in *Williams* and its related cases.

### B.      Plaintiff Was Not Disabled Under the Policy.

Defendant argues that the weight of the evidentiary record indicates that its denial of

benefits was proper in this case. The policy in question requires that, to be considered disabled,

the plaintiff must be:

> unable to perform all of the material and substantial duties of [her] occupation on
> an Active Employment basis because of an Injury or Sickness . . . [a]fter 12
> months of benefits have been paid, the Covered Person is unable to perform, with
> reasonable continuity, all of the material and substantial duties of [her] own or
> any other occupation for which [she] is or becomes reasonably fitted by training,
> education, experience, age and physical and mental capacity.[7]

Defendant's Exhibit A, p. LIB-Garmon 7. The policy further provides that "the Injury must

occur and Disability must begin while the Employee is insured for this coverage." Defendant's

---

[6] *See supra* for a discussion of the full analysis given in *Williams*.

[7] This definition of "disabled" or "disability" applies only to covered persons who are
eligible for the 12 Month Own Occupation Benefit. Defendant's Exhibit A, p. LIB-Garmon 7.
This includes all "Hourly Employees of Baptist Health System, Inc. who are in Active
Employment." Defendant's Exhibit A, p. LIB-Garmon 4.

Exhibit A, p. LIB-Garmon 14. An employee's coverage under the policy ceases on "the date

employment terminates." Defendant's Exhibit A, p. LIB-Garmon 25. Therefore, defendant

argues that to recover disability benefits, plaintiff had to prove that she was disabled on or before

her last day of employment, January 23, 2002.[8]  The policy defines "proof" of disability as:

> the evidence in support of a claim for benefits and includes, but is not limited to:
> (a) a claim form completed and signed (or otherwise formally submitted) by the
> Covered Person claiming benefits; (b) an Attending Physician's statement
> completed and signed (or otherwise formally submitted) by the Covered Person's
> Attending Physician; and (c) provision by the Attending Physician of standard
> diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of
> objective medical evidence that may be required by Liberty in support of a claim
> for benefits.

Defendant's Exhibit A, p. LIB-Garmon 9.

According to defendant, the evidence before it was that plaintiff was not disabled within

the meaning of the policy as of her last date of employment, and therefore defendant's decision

to deny long-term disability benefits was proper.

On March 14, 2002, plaintiff made her initial claim for disability benefits, claiming that

she was disabled due to her symptoms of depression, anxiety, and fibromyalgia. According to

defendant, plaintiff stated that her date of disability was January 24, 2002. Because of this and

the fact that plaintiff's last day as an employee of Baptist Health System Inc. was January 23,

2002, defendant asserts that it initially denied plaintiff's claim for the simple reason that her

---

[8] Defendant notes that the exact date of plaintiff's employment termination has been a
matter of some dispute. However, defendant asserts that, for the purposes of this motion, the
exact date is irrelevant because plaintiff cannot demonstrate that she was disabled on either
January 23 or 24, 2002. This court disagrees.

claim for disability was made while she was no longer a covered employee under the policy.[9]

Plaintiff appealed the denial by arguing that her claim date of disability was the result of a miscommunication. According to defendant, it considered plaintiff's entire medical file and again concluded that, regardless of the date of her disability, she did not have proof of disability within the meaning of the policy at that time. In a June 2, 2002 letter explaining the denial, defendant stated that it had reviewed the records provided by plaintiff from Drs. Patton, Bell, and Perry, and had found "no substantial evidence of total disability." Defendant pointed out in the letter that plaintiff was able to work full time in her own occupation until her day of termination. Defendant claims that plaintiff's medical records reveal only one visit to any of her doctors in January or February 2002. The one record from January 2002, which defendant asserts is the time period relevant to plaintiff's claim for benefits, is a physician's note from plaintiff's January 2, 2002 visit to Dr. Bell. Defendant points out that Dr. Bell's notes for this visit state: "[t]he patient was in *no acute distress*. There was tenderness at the upper thoracic spinous process. The patient *was not obviously depressed*." Defendant's Exhibit A, p. LIB-Garmon 214 (emphasis added). According to defendant, this record supports its conclusion that plaintiff was not totally disabled as of the date of her last day of employment, regardless of which day in January that occurred.[10] Defendant argues plaintiff has not submitted any other record from any physician in the month surrounding her final day of work, other than the note from Dr. Bell,

---

[9] Defendant points out that the policy defines "Covered Person" as "an Employee insured under this policy." Defendant's Exhibit A, p. LIB-Garmon 6. The policy defines "Employee" as "a person in Active Employment with the Sponsor." Defendant's Exhibit A, p. LIB-Garmon 8. As later indicated, this court considers this argument of the defendant that plaintiff was not a covered employee at the time of disability to be frivolous.

[10] See, however, Dr. Bell's other statements.

21

suggesting that she was disabled.

A year and a half later, plaintiff (through counsel) again appealed defendant's denial,

submitting additional medical records and documents evidencing Social Security's award of

benefits. According to defendant, it considered this additional medical information as well as

plaintiff's entire claim file. Defendant asserts it also referred this information to two

independent physicians, who considered the entirety of plaintiff's medical records. In a

summary of his finding, Board Certified Psychiatrist Dr. Robert Polsky stated:

> Based on the information provided, there is no objective medical data that is the
> result of a formal mental status examination to substantiate problems of cognitive
> impairment, memory problems, or problems with concentration. Her complaints
> are of a subjective nature. . . . Ms. Garmon's subjective complaints are not
> substantiated by the medical evidence provided. . . . Based on the records, the
> available clinical documentation does not indicate there was any significant
> worsening in M[s]. Garmon's condition that would dictate her having to stop
> working. . . . There was no objective data to substantiate problems of any
> significant degree with memory, concentration, or cognition.

Defendant's Exhibit A, p. LIB-Garmon 75. Defendant asserts that Dr. Jose Perez, Board

Certified Internal Medicine Physician, reached a similar conclusion, stating:

> Ms. Garmon's self-reported limitations are not substantiated at the time she
> stopped working in 01/02. After careful review of the medical information, most
> of the complaints that Ms. Garmon has are very subjective in nature. . . . Although
> her physical examination is not completely normal, it is not one that supports
> inability to work. . . . Records do not support that her condition, whatever the
> diagnosis, caused an impairment preventing her from being able to perform her
> job duties effective January 2002.

Defendant's Exhibit A, pp. LIB-Garmon 80 - 82. According to defendant, after considering the

entirety of plaintiff's medical records, it found no evidence of total disability and again denied

her appeal.

Defendant claims that plaintiff's arguments rely on conclusory statements by plaintiff's

doctors indicating that she was disabled.  Defendant maintains that, under the rule recognized by

the United States Supreme Court in *Black & Decker Disability Plain v. Nord*, nothing requires it

to accord any special deference to the opinions of plaintiff's treating physicians, or even imposes

a heightened burden of explanation on it should it choose to reject those opinions.  *See Nord*, 538

U.S. 822, 823 (2003) ("Nothing in ERISA or the Secretary of Labor's ERISA regulations,

however, suggests that plan administrators must accord special deference to the opinions of

treating physicians, or imposes a heightened burden of explanation on administrators when they

reject a treating physician's opinion").  Further, defendant concludes, these statements do not

support plaintiff's claim that she was disabled at the time she terminated her employment on

January 23 or 24, 2002.

Defendant points out that, in addition to such physicians' statements, the employee

seeking benefits under the policy must submit "diagnosis, chart notes, lab findings, test results,

x-rays and/or other forms of objective medical evidence" that support the employee's claim.

Defendant's Exhibit A, p. LIB-Garmon 9.  According to defendant, the evidence accompanying

the statements submitted by plaintiff does not support her claim.  Defendant claims that plaintiff

places great reliance on the medical records and statements of Dr. Junkins, who on March 3,

2003 made a statement that plaintiff "is unable to work any more."  Yet, defendant maintains,

this statement is unsupported by the treatment records accompanying it.  For instance, defendant

points out the Dr. Junkins' notes from plaintiff's visit to him on February 25, 2003 state:

> The patient presents to the office for follow up of chronic medical problems
> including fibromyalgia and depression.  The patient has been doing well and has
> no complaints.  There are no medication side effects.  She states that her pain is
> well controlled on the current medication regimen as is her depression.

Defendant's Exhibit A, p. LIB-Garmon 134.  Defendant notes that on this date, Dr. Junkins' only

23

diagnosis was unspecified myalgia and myositis, and his treatment plan was to simply continue

her current medication regimen. *Id.* In other words, defendant claims, over a year after plaintiff

claimed she was unable to work, her own physician stated that she was "doing well and has no

complaints." *Id.* Furthermore, defendant asserts, even if Junkins' records had indicated that

plaintiff was disabled, they would be irrelevant to her claim since she only began seeing Junkins

in October, 2002—nine months after her disability coverage terminated. Similarly, according to

defendant, plaintiff presents no medical evidence supporting disability from Dr. Patton in

January or February, 2002.

      C.    **Application of the Standard of Review.**

     Under the *Williams* analysis, the first step is to apply the *de novo* standard to determine

whether the denial of benefits was wrong on the facts. *Williams v. BellSouth*

*Telecommunications*, 373 F.3d 1132, 1138 (2004). Defendant argues that even under the

strictest possible standard of review, its denial was well-supported by the evidence before it.

Defendant states that it repeatedly reviewed the entirety of plaintiff's medical records and

consulted with independent Board Certified physicians in evaluating plaintiff's claim for

benefits, and consistently concluded that she was not disabled within the meaning of the policy.

According to defendant, if this court finds that its decision was proper under *de novo* review, the

inquiry should end there. Defendant notes that the *Williams* court determined that, "[b]ecause no

grounds exist to disturb Kemper's determination under the *de novo* review standard, we need not

review it under the more deferential ('mere' or 'heightened' arbitrary and capricious) standard."

*Id.* at 1139.

     Defendant argues that, even if this court finds on *de novo* review that defendant's

24

decision was wrong, it should still uphold that decision based on a finding that defendant was vested with clear discretion to make decisions regarding the granting or denial of benefits, and that its decision was supported by reasonable grounds. *Id.* at 1138. According to defendant, even if this court determines that it was operating under a conflict of interest and thus merits a "heightened" arbitrary and capricious review, defendant's determination should still be upheld.

Defendant notes that in *Williams*, the Eleventh Circuit found that the plan's administrator's review of the medical records of several doctors, and its consultation of an independent medical examiner were sufficient to justify the denial of benefits under a *de novo* review. *Id.* at 1139. Defendant argues that since it has taken these steps, and more, its decision should similarly be upheld.[11]

## III.   Plaintiff's Reply.

### A.     Standard of Review

Plaintiff reiterates her argument that the *de novo* standard of review is appropriate in this case. Plaintiff maintains that the language cited by defendant as giving it discretion to determine benefit eligibility, *see supra*, is contained in an insurance contract issued by defendant rather than in a plan document. According to plaintiff, in the Eleventh Circuit the *de novo* standard of review applies unless the benefit plan expressly gives the administrator discretionary authority. To support this proposition, plaintiff again quotes *Moon*, *see supra*, for the proposition that such discretion must be based upon the "express language of the ERISA plan." 888 F.2d at 88. Plaintiff maintains that discretionary authority must be expressly delegated to an insurance

---

[11] The court notes, however, that in *Williams* the claims administrator had the claimant examined by an independent medical examiner. 373 F.3d at 1139. Here defendant has not claimed to have taken such actions.

25

company and that ERISA does not authorize such companies to reserve discretionary authority

unto themselves. In this case, plaintiff asserts, the employer has not delegated discretionary

authority to defendant expressly or otherwise.

**B.     The Insurance Policy Was In Effect When Plaintiff Was Disabled on
        January 2, 2002.**

Plaintiff reasserts her argument that she was disabled on January 2, 2002 but that she

gave a two week notice and worked until January 23, 2002. Plaintiff points to a disability claim

form completed on her behalf by Dr. Perry and received by defendant on March 25, 2002. On

that form Dr. Perry indicated that plaintiff suffered from "[s]evere limitation of function

capacity" and that she was "incapable of minimum activity," having "significant loss of

psychological, physiological, personal, and social adjustment." Dr. Perry also listed plaintiff's

numerous prescribed medications and recommended that she not work. Plaintiff also points to a

handwritten "Restriction Form" completed by Dr. Bell and submitted to defendant, which

indicates that plaintiff was advised to cease work on January 2, 2002. Defendant's Exhibit A, p.

LIB-Garmon 187.

**C.     Plaintiff is Disabled.**

According to plaintiff, in its first denial letter of May 24, 2002, defendant did not deny

that she was disabled, but merely claimed the policy lapsed the day before she became disabled.

Plaintiff points to a June 5, 2002 functional capacity form stating that she was unable to sit,

stand, walk, climb, push, or pull. Furthermore, plaintiff notes that Dr. Bell completed a second

Restriction Form concerning limitations he had imposed on plaintiff after May 2002. Referring

to his earlier Restriction Form and the attached functional capacity form, Dr. Bell stated that

26

plaintiffs restrictions during this time were the same as previously reported. Plaintiff also draws

attention to Dr. Perry's notes from May 7, 2002 in which he stated:

> Pam is seen for FU and complaints of bilateral lower hip pain. She has multiple
> diagnoses including depression, fibromyalgia, and mitral prolapse. Chronic
> tension headaches. She is on multiple medications . . .

### D.    New Submissions Show Disability.

Plaintiff again notes that on March 10, 2004 her counsel submitted additional medical

evidence of disability to defendant, including a psychological evaluation by Dr. Wilson and a

March 3, 2003 letter from Dr. Junkins with attached records. Plaintiff's counsel also submitted

to defendant a copy of plaintiff's Social Security disability award letter dated August 18, 2003.

That letter stated:

> The claimant's impairment, which is considered to be "severe" under the Social
> Security Act, are (*sic*) fibromyalgia. . . . The claimant does not have transferable
> skills to perform other work within her physical and mental residual functional
> capacity. . . . The claimant has been under a disability as defined by the Social
> Security Act and Regulations since January 23, 2002.

### E.    No Clear Discretion.

Plaintiff again cites to the standard of review analysis given in *Williams, see supra,* and

asserts that defendant is not vested with "clear discretion" to make a wrong decision.

### F.    Claim File Submitted by Defendant.

Plaintiff notes that after she submitted additional evidence of disability on March 10,

2004, defendant conducted surveillance of her from March 25 through March 27, 2004.

Defendant's Exhibit A, p. LIB-Garmon 97-104. The surveillance continued until a police officer

instructed the investigator to leave the area. Defendant's Exhibit A, p. LIB-Garmon 98.

Plaintiff argues that nothing in the surveillance discredited her claim for benefits.

27

Plaintiff next addresses the statements by Psychiatrist Dr. Polsky and Internist Dr. Perez, who reviewed plaintiff's claim on defendant's behalf.  Plaintiff points out that, although each supported defendant's position, they also made comments supportive of her claim.  For example, Dr. Polsky stated, "[t]he current treatment plan of medication and individual psychotherapy as suggested by Dr. Wilson is appropriate. . . . Records indicate treatment appropriate for diagnoses."  Defendant's Exhibit A, p. LIB-Garmon 75.  Dr. Perez stated:

> [T]he major diagnoses affecting this 47-year-old female's ability to work are fibromyalgia and chronic fatigue syndrome.  She was also treated for depression and anxiety. . . . This is a complex case.  Ms. Garmon has multiple symptoms beginning probably around the year 1999 or 2000, given that she presented in May 2001, with a year and a half history of symptoms. . . it is difficult to determine whether she has true disability. . . . It is very possible that Ms. Garmon has fibromyalgia based on the application of the ACR classification.  She
>
> 1.  Had widespread pain for more than three months.
> 2.  Had axial skeletal pain.
> 3.  Had pain at in least 11 of the 18 tender points. . . .
>
> Based on objective findings for the diagnosis that is supported here, there is no evidence of a neurologic diagnosis, either weakness or sensory deficit. . . . The diagnosis is as close as possible to fibromyalgia and chronic fatigue syndrome, but she has a number of other diagnoses as well.

Defendant's Exhibit A, p. LIB-Garmon 77-81.

### G.    Objective Evidence.

Plaintiff argues that even though the policy at issue has a provision requiring objective evidence, such a requirement is inappropriate in a fibromyalgia claim for disability.  In support of this argument, plaintiff cites to *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433 (3rd Cir. 1997), in which the court addressed a denial of long-term disability benefits for a person suffering from chronic fatigue syndrome.  In *Mitchell* the court stated:

> According to the record before us, the Administrator denied Mitchell's claim for LTD benefits because Mitchell had failed to tender "*objective medical evidence*" that he was unable to engage in any substantial gainful work as of June 26, 1989.

We hold that, in this context, it was arbitrary and capricious for the Administrator to deny Mitchell LTD benefits for this reason.

113 F.3d at 442.

## ULTIMATE CONCLUSIONS OF THE COURT

The defendant's first given reason for denial appears to be contrived and spurious. A decision that the plaintiff's employment terminated on January 23, 2002 and that, coincidentally, she only became disabled the next day is totally wrong. Defendant's second argument that plaintiff was not disabled because she was able to work full time in her own occupation until her date of termination is similar to the first argument. Again, the date of disability cannot be calibrated so finely. It is not simply a question of "bang" . . . "I'm disabled today and out of here."

Following the six step *Williams* analysis, this court finds and concludes as follows:

(1) Applying a *de novo* standard, the court concludes that the defendant's decision was and is wrong. The defendant started out being wrong by assuming an absolute date certain of the disability with regard to a medical condition that was and is progressive. The defendant's decision was thereafter shaded to maintain this initial position.

As to (2), (3) and (4), it is not necessary for this court to further address the plaintiff's argument, relying on the *Moon* case, that the defendant did not have expressly delegated discretion. That is because as to (5), the court finds and concludes that the defendant has a conflict of interest in that the benefits are payable from its own funds.

(6) Applying a heightened arbitrary and capricious standard, the court concludes that the defendant has not met its burden of establishing that its decision was not tainted by its conflict of interest. Its initial curt determination has influenced its further reviews. Neither the

29

overwhelming opinions of plaintiff's physicians nor the Social Security determination are controlling, but they both support this court's view that the conflict of interest tainted and determined the defendant's decision. The defendant has ignored the progressive nature of the plaintiff's condition.

The court takes judicial notice of the attached Court Exhibit A. The Exhibit bears the imprimatur of both the National Institute of Arthritis and Musculoskeletal and Skin Diseases and the National Institutes of Health Department of Health and Human Services. The facts recited therein are not subject to reasonable dispute because the sources cannot be reasonably questioned. See Federal Rule of Evidence 201 and the notes of the Advisory Committee thereunder. The Exhibit is consistent with plaintiff's history, her physicians' opinions and the progressive nature of her disability, all of which seem to have been ignored by the defendant.

Judgment will be entered for the plaintiff.[12]

This ___ of November, 2004.

ROBERT B. PROPST
**SENIOR UNITED STATES DISTRICT JUDGE**

---

[12] It should be noted that plaintiff's depression is just another symptom of her physical disability, not a separate mental disability. The court does not reach the issue of whether the defendant, through its earlier positions, has waived an argument of allegedly uncovered mental disability.

30



**NIAMS**
National Institute of Arthritis and
Musculoskeletal and Skin Diseases

National Institutes of Health
Department of Health & Human Services



**Court
Exhibit A**

| Home | Health Information | Research & Training Around the Country |
| Research & Training Bethesda Campus | News & Events | About NIAMS |

En español

---

### Health Information

- ➤ **Health Topics**
- ➤ **Order Publications**
- ➤ **Studies with Patients**
- ➤ **Patient Research Registries**
- ➤ **Outreach Programs**
- ➤ **NIAMS Coalition Members**

**Search**

## Health Topics

PDF version

*Publication Date: December 1999*
*Revised: June 2004*

### Questions and Answers About Fibromyalgia

### Table of Contents

- What Is Fibromyalgia?
- Who Gets Fibromyalgia?
- What Causes Fibromyalgia?
- How Is Fibromyalgia Diagnosed?
- How Is Fibromyalgia Treated?
- Will Fibromyalgia Get Better With Time
- What Can I Do To Try To Feel Better?
- What Are Researchers Learning About Fibromyalgia?
- Where Can I Get More Information About Fibromyalgia?
- Key Words

### Information Box

- Tips for Good Sleep

### What Is Fibromyalgia?

Fibromyalgia syndrome is a common and chronic disorder characterized by widespread muscle pain, fatigue, and multiple tender points. The word *fibromyalgia* comes from the Latin term for fibrous tissue (*fibro*) and the Greek ones for muscle (*myo*) and pain (*algia*). Tender points are specific places on the body—on the neck, shoulders, back, hips, and upper and lower extremities—where people with fibromyalgia feel pain in response to slight pressure.

Although fibromyalgia is often considered an arthritisrelated condition, it is not truly a form of arthritis (a disease of the joints) because it does not cause inflammation or damage to the joints, muscles, or other tissues. Like arthritis, however, fibromyalgia can cause significant pain and fatigue, and it can interfere with a person's ability to carry on daily activities. Also like arthritis, fibromyalgia is considered a rheumatic condition.

You may wonder what exactly *rheumatic* means. Even physicians do not always

agree on whether a disease is considered rheumatic. If you look up the word in the dictionary, you'll find it comes from the Greek word *rheum*, which means *flux*—not an explanation that gives you a better understanding. In medicine, however, the term *rheumatic* means a medical condition that impairs the joints and/or soft tissues and causes chronic pain.

In addition to pain and fatigue, people who have fibromyalgia may experience

- sleep disturbances,
- morning stiffness,
- headaches,
- irritable bowel syndrome,
- painful menstrual periods,
- numbness or tingling of the extremities,
- restless legs syndrome,
- temperature sensitivity,
- cognitive and memory problems (sometimes referred to as "fibro fog"), or
- a variety of other symptoms.

Fibromyalgia is a syndrome rather than a disease. Unlike a disease, which is a medical condition with a specific cause or causes and recognizable signs and symptoms, a syndrome is a collection of signs, symptoms, and medical problems that tend to occur together but are not related to a specific, identifiable cause.

## Who Gets Fibromyalgia?

According to a paper published by the American College of Rheumatology (ACR), fibromyalgia affects 3 to 6 million - or as many as one in 50 - Americans. For unknown reasons, between 80 and 90 percent of those diagnosed with fibromyalgia are women; however, men and children also can be affected. Most people are diagnosed during middle age, although the symptoms often become present earlier in life.

People with certain rheumatic diseases, such as rheumatoid arthritis, systemic lupus erythematosus (commonly called lupus), or ankylosing spondylitis (spinal arthritis) may be more likely to have fibromyalgia, too.

Several studies indicate that women who have a family member with fibromyalgia are more likely to have fibromyalgia themselves, but the exact reason for this— whether it be hereditary or caused by environmental factors or both—is unknown. One study supported by the National Institute of Arthritis and Musculoskeletal and Skin Diseases (NIAMS) is trying to identify if certain genes predispose some people to fibromyalgia. (See *What Are Researchers Learning About Fibromyalgia?*)

## What Causes Fibromyalgia?

The causes of fibromyalgia are unknown, but there are probably a number of factors involved. Many people associate the development of fibromyalgia with a physically or emotionally stressful or traumatic event, such as an automobile accident. Some connect it to repetitive injuries. Others link it to an illness. People with rheumatoid arthritis and other autoimmune diseases, such as lupus, are particularly likely to develop fibromyalgia. For others, fibromyalgia seems to occur spontaneously.

Many researchers are examining other causes, including problems with how the central nervous system (the brain and spinal cord) processes pain.

Some scientists speculate that a person's genes may regulate the way his or her body processes painful stimuli. According to this theory, people with fibromyalgia may have a gene or genes that cause them to react strongly to stimuli that most people would not perceive as painful. However, those genes—if they, in fact, exist—have not been identified.

## How Is Fibromyalgia Diagnosed?

Research shows that people with fibromyalgia typically see many doctors before receiving the diagnosis. One reason for this may be that pain and fatigue, the main symptoms of fibromyalgia, overlap with many other conditions. Therefore, doctors often have to rule out other potential causes of these symptoms before making a diagnosis of fibromyalgia. Another reason is that there are currently no diagnostic laboratory tests for fibromyalgia; standard laboratory tests fail to reveal a physiologic reason for pain. Because there is no generally accepted, objective test for fibromyalgia, some doctors unfortunately may conclude a patient's pain is not real, or they may tell the patient there is little they can do.

A doctor familiar with fibromyalgia, however, can make a diagnosis based on two criteria established by the ACR: a history of widespread pain lasting more than 3 months and the presence of tender points. Pain is considered to be widespread when it affects all four quadrants of the body; that is, you must have pain in both your right and left sides as well as above and below the waist to be diagnosed with fibromyalgia. The ACR also has designated 18 sites on the body as possible tender points. For a fibromyalgia diagnosis, a person must have 11 or more tender points. (See illustration on page 5.) One of these predesignated sites is considered a true tender point only if the person feels pain upon the application of 4 kilograms of pressure to the site. People who have fibromyalgia certainly may feel pain at other sites, too, but those 18 standard possible sites on the body are the criteria used for classification.



The location of the nine paired tender points that comprise the 1990 American College of Rheumatology criteria for fibromyalgia.

This illustration is copyrighted by the Arthritis Foundation and may not be reproduced without permission.

## How Is Fibromyalgia Treated?

Fibromyalgia can be difficult to treat. Not all doctors are familiar with fibromyalgia

and its treatment, so it is important to find a doctor who is. Many family physicians, general internists, or rheumatologists (doctors who specialize in arthritis and other conditions that affect the joints or soft tissues) can treat fibromyalgia.

Fibromyalgia treatment often requires a team approach, with your doctor, a physical therapist, possibly other health professionals, and most importantly, yourself, all playing an active role. It can be hard to assemble this team, and you may struggle to find the right professionals to treat you. When you do, however, the combined expertise of these various professionals can help you improve your quality of life.

You may find several members of the treatment team you need at a clinic. There are pain clinics that specialize in pain and rheumatology clinics that specialize in arthritis and other rheumatic diseases, including fibromyalgia.

At present, there are no medications approved by the U.S. Food and Drug Administration (FDA) for treating fibromyalgia, although a few such drugs are in development. Doctors treat fibromyalgia with a variety of medications developed and approved for other purposes.

Following are some of the most commonly used categories of drugs for fibromyalgia:

### Analgesics

Analgesics are painkillers. They range from over-the-counter acetaminophen (Tylenol\*) to prescription medicines, such as tramadol (Ultram), and even stronger narcotic preparations. For a subset of people with fibromyalgia, narcotic medications are prescribed for severe muscle pain. However, there is no solid evidence showing that narcotics actually work to treat the chronic pain of fibromyalgia, and most doctors hesitate to prescribe them for long-term use because of the potential that the person taking them will become physically or psychologically dependent on them.

\* Brand names included in this booklet are provided as examples only, and their inclusion does not mean that these products are endorsed by the National Institutes of Health or any other Government agency. Also, if a particular brand name is not mentioned, this does not mean or imply that the product is unsatisfactory.

### Nonsteroidal Anti-Inflammatory Drugs (NSAIDs)

As their name implies, nonsteroidal anti-inflammatory drugs, including aspirin, ibuprofen (Advil, Motrin), and naproxen sodium (Anaprox, Aleve), are used to treat inflammation. Although inflammation is not a symptom of fibromyalgia, NSAIDs also relieve pain. The drugs work by inhibiting substances in the body called prostaglandins, which play a role in pain and inflammation. These medications, some of which are available without a prescription, may help ease the muscle aches of fibromyalgia. They may also relieve menstrual cramps and the headaches often associated with fibromyalgia.

### Antidepressants

Perhaps the most useful medications for fibromyalgia are several in the antidepressant class. Antidepressants elevate the levels of certain chemicals in the brain, including serotonin and norepinephrine (which was formerly called adrenaline). Low levels of these chemicals are associated not only with depression, but also with pain and fatigue. Increasing the levels of these chemicals can reduce pain in people who have fibromyalgia. Doctors prescribe several types of antidepressants for people with fibromyalgia, described below.

- **Tricyclic antidepressants**—When taken at bedtime in dosages lower than those used to treat depression, tricyclic antidepressants can help promote restorative sleep in people with fibromyalgia. They also can relax painful muscles and heighten the effects of the body's natural pain-killing substances called endorphins.

  Tricyclic antidepressants have been around for almost half a century. Some examples of tricyclic medications used to treat fibromyalgia include amitriptyline hydrochloride (Elavil, Endep), cyclobenzaprine (Cycloflex, Flexeril, Flexiban), doxepin (Adapin, Sinequan), and nortriptyline (Aventyl, Pamelor). Both amitriptyline and cyclobenzaprine have been proved useful for the treatment of fibromyalgia.

- **Selective serotonin reuptake inhibitors**—If a tricyclic antidepressant fails to bring relief, doctors sometimes prescribe a newer type of antidepressant called a selective serotonin reuptake inhibitor (SSRI). As with tricyclics, doctors usually prescribe these for people with fibromyalgia in lower dosages than are used to treat depression. By promoting the release of serotonin, these drugs may reduce fatigue and some other symptoms associated with fibromyalgia. The group of SSRIs includes fluoxetine (Prozac), paroxetine (Paxil), and sertraline (Zoloft).

  SSRIs may be prescribed along with a tricyclic antidepressant. Doctors rarely prescribe SSRIs alone. Because they make people feel more energetic, they also interfere with sleep, which often is already a problem for people with fibromyalgia. Studies have shown that a combination therapy of the tricyclic amitriptyline and the SSRI fluoxetine resulted in greater improvements in the study participants' fibromyalgia symptoms than either drug alone.

- **Mixed reuptake inhibitors**—Some newer antidepressants raise levels of both serotonin and norepinephrine, and are therefore called mixed reuptake inhibitors. Examples of these medications include venlafaxine (Effexor) and nefazadone (Serzone). Researchers are actively studying the efficacy of these newer medications in treating fibromyalgia.

### Benzodiazepines

Benzodiazepines help some people with fibromyalgia by relaxing tense, painful muscles and stabilizing the erratic brain waves that can interfere with deep sleep. Benzodiazepines also can relieve the symptoms of restless legs syndrome, which is common among people with fibromyalgia. Restless legs syndrome is characterized by unpleasant sensations in the legs as well as twitching, particularly at night. Because of the potential for addiction, doctors usually prescribe benzodiazepines only for people who have not responded to other therapies. Benzodiazepines include clonazepam (Klonopin) and diazepam (Valium).

### Other medications

In addition to the previously described general categories of drugs, doctors may prescribe others, depending on a person's specific symptoms or fibromyalgia-related conditions. For example, in recent years, two medications— tegaserod (Zelnorm) and alosetron (Lotronex) - have been approved by the FDA for the treatment of irritable bowel syndrome. Gabapentin (Neurontin) currently is being studied as a treatment for fibromyalgia. (See *What Are Researchers Learning About Fibromyalgia?*.) Other symptom-specific medications include sleep medications, muscle relaxants, and headache remedies.

People with fibromyalgia also may benefit from a combination of physical and occupational therapy, from learning pain-management and coping techniques, and from properly balancing rest and activity.

*Complementary and alternative therapies*

Many people with fibromyalgia also report varying degrees of success with complementary and alternative therapies, including massage, movement therapies (such as Pilates and the Feldenkrais method), chiropractic treatments, acupuncture, and various herbs and dietary supplements for different fibromyalgia symptoms. (For more information on complementary and alternative therapies, contact the National Center for Complementary and Alternative Medicine. See *Where Can I Get More Information About Fibromyalgia?*.)

Though some of these supplements are being studied for fibromyalgia, there is little, if any, scientific proof yet that they help. The FDA does not regulate the sale of dietary supplements, so information about side effects, the proper 12 dosage, and the amount of a preparation's active ingredient may not be well known. If you are using or would like to try a complementary or alternative therapy, you should first speak with your doctor, who may know more about the therapy's effectiveness, as well as whether it is safe to try in combination with your medications.

## Will Fibromyalgia Get Better With Time?

Fibromyalgia is a chronic condition, meaning it lasts a long time - possibly a lifetime. However, it may comfort you to know that fibromyalgia is not a progressive disease. It is never fatal, and it won't cause damage to your joints, muscles, or internal organs. In many people, the condition does improve over time.

## What Can I Do To Try To Feel Better?

Besides taking medicine prescribed by your doctor, there are many things you can do to minimize the impact of fibromyalgia on your life. These include:

- **Getting enough sleep**—Getting enough sleep and the right kind of sleep can help ease the pain and fatigue of fibromyalgia. (See *Tips for Good Sleep*.) Even so, many people with fibromyalgia have problems such as pain, restless legs syndrome, or brain-wave irregularities that interfere with restful sleep.
- **Exercising**—Though pain and fatigue may make exercise and daily activities difficult, it's crucial to be as physically active as possible. Research has repeatedly shown that regular exercise is one of the most effective treatments for fibromyalgia. People who have too much pain or fatigue to do vigorous exercise should begin with walking or other gentle exercise and build their endurance and intensity slowly. Although research has focused largely on the benefits of aerobic and flexibility exercises, a new NIAMS-supported study is examining the effects of adding strength training to the traditionally prescribed aerobic and flexibility exercises.
- **Making changes at work**—Most people with fibromyalgia continue to work, but they may have to make big changes to do so; for example, some people cut down the number of hours they work, switch to a less demanding job, or adapt a current job. If you face obstacles at work, such as an uncomfortable desk chair that leaves your back aching or difficulty lifting heavy boxes or files, your employer may make adaptations that will enable you to keep your job. An occupational therapist can help you design a more comfortable workstation or find more efficient and less painful ways to lift.

If you are unable to work at all due to a medical condition, you may qualify for

disability benefits through your employer or the Federal Government.

Social Security Disability Insurance (SSDI) and Supplemental Security Insurance (SSI) are the largest Federal programs providing financial assistance to people with disabilities. Though the medical requirements for eligibility are the same under the two programs, the way they are funded is different. SSDI is paid by Social Security taxes, and those who qualify for assistance receive benefits based on how much an employee has paid into the system; SSI is funded by general tax revenues, and those who qualify receive payments based on financial need. For information about the SSDI and SSI programs, contact the Social Security Administration. (See *Where Can I Get More Information About Fibromyalgia?*.)

- **Eating well**—Although some people with fibromyalgia report feeling better when they eat or avoid certain foods, no specific diet has been proven to influence fibromyalgia. Of course, it is important to have a healthy, balanced diet. Not only will proper nutrition give you more energy and make you generally feel better, it will also help you avoid other health problems.

## Tips for Good Sleep

- Keep regular sleep habits. Try to get to bed at the same time and get up at the same time every day—even on weekends and vacations.
- Avoid caffeine and alcohol in the late afternoon and evening. If consumed too close to bedtime, the caffeine in coffee, soft drinks, chocolate, and some medications can keep you from sleeping or sleeping soundly. Even though it can make you feel sleepy, drinking alcohol around bedtime also can disturb sleep.
- Time your exercise. Regular daytime exercise can improve nighttime sleep. But avoid exercising within 3 hours of bedtime, which actually can be stimulating, keeping you awake.
- Avoid daytime naps. Sleeping in the afternoon can interfere with nighttime sleep. If you feel you can't get by without a nap, set an alarm for 1 hour. When it goes off, get up and start moving.
- Reserve your bed for sleeping. Watching the late news, reading a suspense novel, or working on your laptop in bed can stimulate you, making it hard to sleep.
- Keep your bedroom dark, quiet, and cool.
- Avoid liquids and spicy meals before bed. Heartburn and latenight trips to the bathroom are not conducive to good sleep.
- Wind down before bed. Avoid working right up to bedtime. Do relaxing activities, such as listening to soft music or taking a warm bath, that get you ready to sleep. (An added benefit of the warm bath: It may soothe aching muscles.)

## What Are Researchers Learning About Fibromyalgia?

The NIAMS sponsors research that will improve scientists' understanding of the specific problems that cause or 16 accompany fibromyalgia, in turn helping them develop better ways to diagnose, treat, and prevent this syndrome.

The research on fibromyalgia supported by NIAMS covers a broad spectrum, ranging from basic laboratory research to studies of medications and interventions

designed to encourage behaviors that reduce pain and change behaviors that worsen or perpetuate pain.

Following are descriptions of some of the promising research now being conducted:

- **Understanding pain**—Because research suggests that fibromyalgia is caused by a problem in how the body processes pain—or more precisely, a hypersensitivity to stimuli that normally are not painful—several NIAMS-supported researchers are focusing on ways the body processes pain to better understand why people with fibromyalgia have increased pain sensitivity.

  Previous research has shown that people with fibromyalgia have reduced blood flow to parts of the brain that normally help the body deal with pain. In one new NIAMS-funded study, researchers will be using imaging technology called positron emission tomography (PET) to compare blood flow in the brains of women who have have fibromyalgia with those who do not. In both groups, researchers will study changes in blood flow that occur in response to painful stimuli.

  Researchers speculate that female reproductive hormones may be involved in the increased sensitivity to pain characteristic of fibromyalgia. New research will examine the role of sex hormones in pain sensitivity, in reaction to stress, and in symptom perception at various points in the menstrual cycles of women with fibromyalgia and of women without it. The results from studying these groups of women will be compared with results from studies of the same factors in men without fibromyalgia over an equivalent period of time.

  Another line of NIAMS-funded research involves developing a rodent model of fibromyalgia pain. Rodent models, which use mice or rats that researchers cause to develop symptoms similar to fibromyalgia in humans, could provide the basis for future research into this complex condition.

- **Understanding stress**—Medical evidence suggests that a problem or problems in the way the body responds to physical and/or emotional stress may trigger or worsen the symptoms of any illness, including fibromyalgia. Researchers funded by NIAMS are trying to uncover and understand these problems by examining chemical interactions between the nervous system and the endocrine (hormonal) system. Scientists know that people whose bodies make inadequate amounts of the hormone cortisol experience many of the same symptoms as people with fibromyalgia, so they also are exploring if there is a link between the regulation of the adrenal glands, which produce cortisol, and fibromyalgia.

  Another NIAMS-funded study suggests that exercise improves the body's response to stress by enhancing the function of the pituitary and adrenal glands. The hormones produced by these two endocrine glands are essential to regulating sleep and emotions, as well as processing pain.

- **Improving sleep**—Researchers supported by NIAMS are investigating ways to improve sleep for people with fibromyalgia whose sleep problems persist despite treatment with medications. One team has observed that fibromyalgia patients with persistent sleep problems share characteristics with people who have insomnia, such as having erratic sleep and wake schedules and spending too much time in bed. This team is testing whether strategies developed to help insomnia patients will also help people with fibromyalgia achieve deep sleep, which eases pain and fatigue. Preliminary results show

that sleep education, which teaches good sleep habits, and cognitive behavioral therapy, which includes sleep education and a regimen to correct poor habits and improper sleep schedules, both reduce insomnia.

- **Looking for the family connection**—Because fibromyalgia appears to run in families, one group of NIAMS-supported researchers is working to identify whether a gene or genes predispose people to the condition.

  Another team is trying to determine if fibromyalgia is more common in people with other conditions, such as serious mood disorders, that tend to run in families. Specifically, the group is studying the prevalence of psychiatric disorders and arthritis and related disorders in people with fibromyalgia and their first-degree relatives (parents, children, sisters, brothers) as compared to people with rheumatoid arthritis and their relatives. The group is exploring whether clusters of conditions exist in families, which might shed light on shared common risk factors or disease processes.

- **Studying and targeting treatments**—NIAMS recently funded its first study of a drug treatment for fibromyalgia. The study will measure the effectiveness of gabapentin, an anticonvulsant medication, in reducing symptoms of fibromyalgia. Gabapentin has been found to relieve chronic pain caused by nervous system disorders, and it was recently approved by the FDA for the treatment of persistent, severe pain that can follow an episode of shingles.

  Scientists recognize that people with fibromyalgia often fall into distinct subgroups that adapt to and cope with their symptoms differently. They also realize that these subgroups may respond to treatments differently. One NIAMS-funded team of researchers has divided people with fibromyalgia into three groups based on how they cope with the condition. Relative to other chronic pain patients, those in the first group have higher levels of pain and report more interference in their life due to pain. They also have higher levels of emotional distress, and feel less control over their lives and are less active. The second group reports receiving less support from others, higher levels of negative responses from significant others, and lower levels of supportive responses from significant others. Those in the third group are considered adaptive copers; they have less pain, report less interference in their lives due to pain, and have less emotional distress. Members of this last group feel more control over their lives and are more active. On the premise that the better you understand the subgroups, the better you can tailor treatments to fit them, the researchers now are trying to design and test different programs for each group, combining physical therapy, interpersonal skills training, and supportive counseling.

## Where Can I Get More Information About Fibromyalgia?

- **National Institute of Arthritis and Musculoskeletal and Skin Diseases (NIAMS)**
  National Institutes of Health
  1 AMS Circle
  Bethesda, MD 20892-3675
  Phone: 877-22-NIAMS (226-4267) (free of charge)
  TTY: 301-565-2966
  Fax: 301-718-6366
  E-mail: NIAMSInfo@mail.nih.gov
  www.niams.nih.gov

- **National Center for Complementary and Alternative Medicine**
  National Institutes of Health

P.O. Box 7923
Gaithersburg, MD 20898-7923
Phone: 888-644-6226 (free of charge)
TTY: 866-464-3615 (free of charge)
Fax: 866-464-3616 (free of charge)
E-mail: info@nccam.nih.gov
www.nccam.nih.gov

- **Social Security Administration**
  Office of Public Inquiries
  Windsor Park Building
  6401 Security Boulevard
  Baltimore, MD 21235
  Phone: 800-772-1213 (free of charge)
  TTY: 800-325-0778 (free of charge)
  www.ssa.gov/disability

- **American College of Rheumatology/Association of Rheumatology Health Professionals**
  1800 Century Place, Suite 250
  Atlanta, GA 30345-4300
  Phone: 404-633-3777
  Fax: 404-633-1870
  www.rheumatology.org

- **Advocates for Fibromyalgia Funding, Treatment, Education, and Research**
  P.O. Box 768
  Libertyville, IL 60048-0766
  Phone: 847-362-7807
  Fax: 847-680-3922
  E-mail: info@affter.org
  www.affter.org

- **Fibromyalgia Network**
  P.O. Box 31750
  Tucson, AZ 85751-1750
  Phone: 800-853-2929 (free of charge)
  www.fmnetnews.com

- **National Fibromyalgia Association**
  2200 N. Glassell Street, Suite "A"
  Orange, CA 92865
  Phone: 714-921-0150
  www.fmaware.org

- **National Fibromyalgia Partnership**
  P.O. Box 160
  Linden, VA 22642-0160
  Phone: 866-725-4404 (free of charge)
  Fax: 866-666-2727 (free of charge)
  E-mail: mail@fmpartnership.org
  www.fmpartnership.org

- **Arthritis Foundation**
  1330 West Peachtree Street
  Atlanta, GA 30309
  Phone: 404-872-7100 or
  800-283-7800 (free of charge) or call your local chapter

(To find your local chapter, check your phone directory or visit the
foundation's Web site.)
www.arthritis.org

## Key Words

**Adrenal glands**—A pair of endocrine glands located on the surface of the kidneys.
The adrenal glands produce corticosteroid hormones such as cortisol, aldosterone,
and the reproductive hormones.

**Arthritis**—Literally means joint inflammation, but is often used to indicate a group of
more than 100 rheumatic diseases. These diseases affect not only the joints but also
other connective tissues of the body, including important supporting structures, such
as muscles, tendons, and ligaments, as well as the protective covering of internal
organs.

**Analgesic**—A medication or treatment that relieves pain.

**Connective tissue**—The supporting framework of the body and its internal organs.

**Chronic disease**—An illness that lasts for a long time, often a lifetime.

**Cortisol**—A hormone produced by the adrenal cortex, important for normal
carbohydrate metabolism and for a healthy response to stress.

**Fibrous capsule**—A tough wrapping of tendons and ligaments that surrounds the
joint.

**Fibromyalgia**—A chronic syndrome that causes pain and stiffness throughout the
connective tissues that support and move the bones and joints. Pain and localized
tender points occur in the muscles, particularly those that support the neck, spine,
shoulders, and hip. The disorder includes widespread pain, fatigue, and sleep
disturbances.

**Inflammation**—A characteristic reaction of tissues to injury or disease. It is marked
by four signs: swelling, redness, heat, and pain. Inflammation is not a symptom of
fibromyalgia.

**Joint**—A junction where two bones meet. Most joints are composed of cartilage,
joint space, fibrous capsule, synovium, and ligaments.

**Ligaments**—Bands of cordlike tissue that connect bone to bone.

**Muscle**—A structure composed of bundles of specialized cells that, when stimulated
by nerve impulses, contract and produce movement.

**Nonsteroidal anti-inflammatory drugs (NSAIDs)**—A group of drugs, such as
aspirin and aspirin-like drugs, used to reduce inflammation that causes joint pain,
stiffness, and swelling.

**Pituitary gland**—A pea-sized gland attached beneath the hypothalamus at the base
of the skull that secretes many hormones essential to bodily functioning. The
secretion of pituitary hormones is regulated by chemicals produced in the
hypothalamus.

**Sleep disorder**—A disorder in which a person has difficulty achieving restful,

restorative sleep. In addition to other symptoms, people with fibromyalgia usually have a sleep disorder.

**Tender points**—Specific places on the body where a person with fibromyalgia feels pain in response to slight pressure.

**Tendons**—Fibrous cords that connect muscle to bone.

## Acknowledgments

The NIAMS gratefully acknowledges the assistance of Deborah Ader, Ph.D., NIAMS, NIH; Karen Amour and Lynne Matallana, National Fibromyalgia Association, Orange, CA; Michele L. Boutaugh, M.P.H., Arthritis Foundation, Atlanta, GA; Daniel Clauw, M.D., and Leslie Crofford, M.D., University of Michigan, Ann Arbor; and Tamara Liller, National Fibromyalgia Partnership, Linden, VA, in the preparation of this booklet.

The mission of the National Institute of Arthritis and Musculoskeletal and Skin Diseases (NIAMS), a part of the Department of Health and Human Services' National Institutes of Health (NIH), is to support research into the causes, treatment, and prevention of arthritis and musculoskeletal and skin diseases, the training of basic and clinical scientists to carry out this research, and the dissemination of information on research progress in these diseases. The National Institute of Arthritis and Musculoskeletal and Skin Diseases Information Clearinghouse is a public service sponsored by the NIAMS that provides health information and information sources. Additional information can be found on the NIAMS Web site at www.niams.nih.gov.

NIH Publication NO. 04-5326
June 2004

Privacy Statement             Back to top

  

NIAMS    DHHS    NIH

**FIRSTGOV**